STATE OF CONNECTICUT *v.* MARCELINO
LASALLE, JR.
(AC 26650)

Schaller, Gruendel and Harper, Js.

Argued January 3—officially released May 9, 2006

*Elizabeth M. Inkster*, senior assistant public defender, for the appellant (defendant).

*Lawrence J. Tytla,* senior assistant state's attorney, with whom, on the brief, was *Kevin T. Kane,* state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Marcelino LaSalle, Jr., appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a).[1] On appeal, the defendant claims that (1) there was insufficient evidence to convict him of murder, (2) the court improperly declined to instruct the jury that the use of a deadly weapon, by itself, does not establish the intent to kill and (3) the court improperly instructed the jury on the state's burden to prove guilt beyond a reasonable doubt. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On June 22, 2002, the defendant was a tenant at the Rand Lodge, a boarding house, in Groton. Sometime during the late afternoon or early evening, the defendant approached James Colegrove, another tenant at the boarding house, outside of Colegrove's room on the first floor. The defendant apologized for causing noise around the boarding house several nights earlier. He also mentioned that Grover Bressert, the manager of the boarding house, planned to evict him. The defendant said that he needed to get a rent receipt from Bressert and that he would be back "to get everyone that was . . . running their mouth" about him.

At approximately 6 p.m. the same day, the defendant approached Cathleen Kosloskey, another tenant at the boarding house. The defendant began yelling at Kosloskey that she had "loose lips" and that he was getting evicted because she told Bressert about a fight that

---

[1] The court sentenced the defendant to a total effective term of fifty-three years imprisonment.

the defendant was involved in outside of the boarding house. He told Kosloskey that he was going to go from room to room to find out who told Bressert about him and that "he was going to turn the place out." After asking whether she wanted to get high with him, the defendant told Kosloskey that she "would cease to exist" and that she would "be done." He then warned her not to come home that night or she would be dead. Kosloskey left the boarding house immediately after the defendant made these threats.

Several hours later, the defendant went to Bressert's room on the first floor of the boarding house. While there, the defendant cut and stabbed Bressert four times with a sharp knife.[2] He cut Bressert on his cheek and on the back of his shoulder, and stabbed him on the right side of his neck and on the right side of his chest. The wound to Bressert's chest cut his second rib, the top part of his lung and his aorta, causing blood to collect in his thoracic cavity around the lungs and heart. He died as a result of this wound not long after it was inflicted.

After killing Bressert, the defendant walked toward a motel approximately one tenth of a mile from the boarding house. While in the parking lot of the motel, the defendant encountered John Stone, the owner of the motel. The defendant's shorts were covered in blood, prompting Stone to ask the defendant to leave the property. When the defendant failed to leave the property, Stone held up a bottle of commercial strength cleaning fluid that he had in his hand and told the defendant that he would spray him in the eyes if the defendant came any closer. As a result, the defendant proceeded

---

[2] An autopsy performed on Bressert revealed that he suffered from two types of wounds. Two of his wounds were incised wounds, which were described at trial as cuts that penetrated only the skin and the fat tissue. In addition, Bressert had two stab wounds, which were described at trial as wounds that penetrated the body.

to walk back toward the boarding house, and Stone called the police.

In the hour that followed Bressert's death, the defendant tried to conceal his involvement by washing the knife he used and hiding it in a paper bag in his room. He placed the shorts and socks that he had been wearing, which were covered in Bressert's blood, in a plastic bag. He then hid the plastic bag in the kitchen oven located in a common area of the boarding house. In addition, he discarded the bloodstained sweatshirt that he had been wearing and a towel that was covered in Bressert's blood on properties surrounding the boarding house.

At approximately 10 p.m., the defendant was stopped by Michael Masucci, an officer with the Groton city police department, as the defendant walked along a road heading away from the boarding house. By this time, several other officers had discovered Bressert's body. Masucci asked the defendant to stop so that Masucci could question him and check him for weapons. He had a brief conversation with the defendant, but did not notice anything unusual about his speech. As Masucci began to check the defendant for weapons, the defendant swung at David Migliozzi, another officer with the Groton city police department, who had stopped to help Masucci. A scuffle ensued between the defendant and the officers, and the defendant was subsequently arrested.[3] He was later charged with Bressert's murder. Additional facts will be set forth as necessary.

## I

The defendant first claims that the evidence was insufficient to support his conviction of murder. Specifi-

---

[3] The defendant was not arrested for Bressert's murder at that time. Rather, his arrest was in relation to the scuffle that had occurred between him and the police officers.

cally, the defendant claims that the state failed to prove that the defendant had the specific intent to kill Bressert because there was uncontroverted evidence that the defendant was intoxicated. We disagree.

The following additional facts are relevant to our review of the defendant's claim. At trial, the defendant presented testimony from James O'Brien, a physician who also has a doctorate degree in pharmacology. O'Brien testified that he had reviewed the emergency room report from Lawrence and Memorial Hospital in New London, where the defendant was taken for treatment after he was arrested. The report indicated that the defendant had a serum alcohol level of 0.2 percent at 12:40 a.m., which O'Brien testified translated to a blood alcohol level of 0.167 percent. Using the defendant's height and weight, and his blood alcohol level at 12:40 a.m., O'Brien performed retrograde analysis to determine what the defendant's blood alcohol level would have been at approximately 9 p.m., on the basis of certain assumptions. If the defendant had not consumed any alcoholic beverages after 9 p.m., O'Brien testified, the defendant would have had a blood alcohol level of 0.233 percent at 9 p.m.[4] If the defendant had consumed two beers after 9 p.m., O'Brien testified, the defendant would have had a blood alcohol level of 0.185 percent at 9 p.m. On cross-examination, O'Brien stated that he did not know what type of alcohol the defendant had been drinking and did not know whether the defendant consumed any alcohol after 9 p.m.[5]

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the suffi-

[4] O'Brien testified that, assuming the defendant was drinking twelve ounce beers with average alcohol content, the defendant would have had to drink 9.7 beers to obtain a blood alcohol level of 0.233 percent.

[5] O'Brien stated that he had reviewed information indicating that Colegrove had seen the defendant drinking beer at some point during the day that Bressert was killed, but O'Brien could not remember where he had seen that information.

ciency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of inno-

cence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

To establish the crime of murder, the state bears the burden of proving beyond a reasonable doubt that the defendant, "with intent to cause the death of another person . . . cause[d] the death of such person or of a third person . . . ." General Statutes § 53a-54a (a). As our Supreme Court has noted, "[t]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . .

"Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct. . . . In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill." (Citations omitted; internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 406–407, 869 A.2d 1236 (2005).

The defendant argues that there was insufficient evidence of his intent to kill because there was undisputed

evidence that he was intoxicated at the time of Bressert's death. "Intoxication, as used in General Statutes § 53a-7, means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body." (Internal quotation marks omitted.) *Lindo* v. *Mullaney*, 78 Conn. App. 827, 835, 829 A.2d 86, cert. denied, 266 Conn. 920, 835 A.2d 60 (2003). "[W]hile intoxication is neither a defense nor an affirmative defense to a murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder. . . . Intoxication, however, does not automatically negate intent. . . . It is for the jury to decide, after weighing all the evidence adduced at trial, whether a criminal defendant's intoxication rendered him incapable of forming the intent required to commit the crime with which he is charged." (Citation omitted; internal quotation marks omitted.) *State* v. *Colon*, 70 Conn. App. 707, 724–25, 799 A.2d 317, cert. denied, 261 Conn. 933, 806 A.2d 1067 (2002).

In the present case, the state presented evidence that Bressert had recently informed the defendant that he was being evicted from the boarding house. The night Bressert was killed, the defendant approached two other tenants at the boarding house and made threatening remarks to both of them, going so far as to tell Kosloskey that she would "cease to exist" and that she would be dead if she returned home later that evening. Stone saw the defendant later that night with his shorts covered in blood. Furthermore, the evidence recovered from the scene of the crime, the defendant's room, the common areas of the boarding house and the properties surrounding the boarding house included numerous articles of clothing that belonged to the defendant and that were covered with Bressert's blood. The bloody shorts and socks that Stone saw the defendant wearing were found in the kitchen oven of the common area

near the defendant's room. The bloodstained sweatshirt the defendant had been wearing, as well as a blood-stained towel that resembled one found in the defendant's room, were found on the properties surrounding the boarding house. In addition, a knife that had been washed recently was discovered in the defendant's room.

Thus, the jury had before it evidence that the defendant was angry with Bressert for evicting him and that the defendant had threatened two other tenants within hours of Bressert's death. These statements were highly indicative of the defendant's state of mind at the time of the crime. Moreover, Bressert was stabbed multiple times with a sharp knife, resulting in several wounds, one of which was a deep stab to the area around Bressert's heart. As our Supreme Court has reasoned, "[o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill." (Internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 259, 681 A.2d 922 (1996); see also *State* v. *Moore*, 82 Conn. App. 267, 272, 843 A.2d 652, cert. denied, 269 Conn. 904, 852 A.2d 734 (2004). Here, the defendant stabbed Bressert in the neck and chest area, using enough force to cut his rib, lung and aorta. Given the location and depth of Bressert's stab wounds, it was not unreasonable for the jury to infer that the defendant intended to kill Bressert.

The jury also had before it evidence that the defendant attempted to conceal the murder by washing the knife that he used to kill Bressert and by hiding his bloodstained clothing in the kitchen oven and on the surrounding properties. This conduct by the defendant after the crime reflected the defendant's consciousness of guilt, as well as his intent to conceal the evidence of his criminal conduct.

Although the defendant asserts that the evidence of his intoxication was undisputed, several police officers who spoke with him on the evening of June 22, 2002, testified that he spoke normally and showed no signs of intoxication. Moreover, O'Brien's testimony, which served as the backbone of the defendant's theory of defense, was based largely on assumptions regarding the type of alcohol that the defendant consumed and how much alcohol the defendant consumed after 9 p.m. There was no evidence, however, of what type of alcohol the defendant had consumed or how much he had consumed by the time of the murder.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was sufficient evidence for the jury reasonably to conclude beyond a reasonable doubt that the defendant had the specific intent to kill Bressert. It was the jury's responsibility to determine whether the defendant was intoxicated at the time of the murder and, if the jury determined that he was, whether he still was able to form the specific intent to kill. The defendant threatened other tenants at the boarding house hours before Bressert was killed, he stabbed Bressert in the chest and neck area with a sharp knife, and he attempted to conceal his actions by washing the knife, hiding his bloodstained clothing and leaving the scene of the crime. On the basis of the cumulative impact of these facts, and the reasonable inferences drawn therefrom, the jury reasonably could have concluded that the defendant had the specific intent to kill Bressert.

## II

The defendant next claims that the court improperly declined to give the jury the instruction that he requested on intent, thereby depriving him of due process of law in violation of the federal and state constitutions by shifting the state's burden of proof on the

essential element of intent. Specifically, the defendant challenges the court's failure to instruct the jury that the use of a deadly weapon, by itself, does not prove an intent to cause the death of the victim and to commit the crime of murder. We disagree.

In a written request to charge, the defendant requested that the court instruct the jury that "[a]n intent to cause death may be inferred from circumstantial evidence such as the type of instrument or weapon used, the manner in which it was used and the type of wound inflicted. *However, you are instructed that the use of a weapon, such as a knife, does not in and of itself prove an intent to cause the death of the victim and to commit the [crime] of murder.*" (Emphasis added.) The court declined to include the second sentence of the defendant's request as part of its instructions to the jury. Rather, the court instructed the jury on the element of intent as follows: "The first element is that the defendant had the intent to cause the death of another person, here, Grover Bressert. The state must prove beyond a reasonable doubt that the defendant in causing the death of Mr. Bressert did so with the specific intent to cause death.

"There is no particular length of time necessary for the defendant to have formed the specific intent to kill. Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. As defined by our statute, a person acts intentionally with respect to a result when his conscious objective is to cause such result. Intentional conduct is purposeful conduct rather than conduct that is accidental or inadvertent.

"What a person's intent has been is usually a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain intention to do harm to another. The only way in which a jury can ordinarily determine what

a person's intention was at any given time, aside from that person's own statements, is by determining what that person's conduct was and what the circumstances were surrounding that conduct and, from those, infer what his intention was.

"The type and number of wounds inflicted, as well as the instrument used, *may* be considered as evidence of the perpetrator's intent and, from such evidence, an inference *may* be drawn in some cases that there was intent to cause a death. Any inference that *may* be drawn from the nature of the instrumentality used and the manner of its use is an inference of fact to be drawn by the jury upon consideration of these and all other circumstances in the case in accordance with my previous instructions on circumstantial evidence.

"Declarations and conduct of the accused before and after the infliction of wounds *may* be considered if you find that they tend to show the defendant's intent. Therefore, you *may* draw all reasonable and logical inferences from the conduct you *may* find the defendant engaged in in light of all the surrounding circumstances and, from [those], determine whether the state has proven the essential element of intent beyond a reasonable doubt.

"This inference is not a necessary one; that is, you are not required to infer intent from the accused's alleged conduct, but it is an inference you *may* draw if you find it is reasonable and logical and in accordance with my instructions on circumstantial evidence. I again remind you that the burden of proving intent beyond a reasonable doubt is on the state." (Emphasis added.)

Because the defendant challenges the adequacy of the court's instruction on the element of intent, we begin by noting that "an improper jury instruction as to an essential element of the crime charged may result in the violation of the defendant's due process right to

a fair trial, and thus require the reversal of a conviction based upon that instruction. . . . When reviewing the challenged jury instruction, however, we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . [I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Citation omitted; internal quotation marks omitted.) *State* v. *Smith*, 70 Conn. App. 393, 398, 797 A.2d 1190, cert. denied, 261 Conn. 924, 806 A.2d 1063 (2002).

"While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 368–69, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003).

Reviewing the court's instruction as a whole, we cannot conclude that it is reasonably possible that the jury was misled by court's failure to include the defendant's requested language. The defendant argues that the court's "truncated charge" deprived the defendant of the opportunity to convince the trier of fact that, despite

his intentional use of a deadly weapon, he did not intend to kill Bressert. The defense fails to recognize, however, that the court's entire instruction on intent was prefaced with the use of the permissive "may." Similar language was recently cited with approval by our Supreme Court in *State* v. *Smith*, 275 Conn. 205, 238–39, 881 A.2d 160 (2005). In that case, the Supreme Court relied on its holding in *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002), and noted that "the trial court's instruction was qualified, both immediately preceding and following the challenged language, by its use of the permissive may. . . . We have determined previously that the inclusion of such permissive language tempers the challenged portion of the instruction and ensures that a reasonable jury will not interpret the charge in an unconstitutional manner." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 239. The court's instruction in the present case was further tempered by the emphasis at the end of the charge on intent that the inferences based on conduct were not necessary or required. In addition, the court twice reminded the jury that the state maintained the burden of proof with respect to the defendant's intent. We conclude, therefore, that the charge as a whole was correct in the law, adapted to the issues of the case and was sufficient for the guidance of the jury such that it is not reasonably possible that the jury was misled by the court's omission of the language requested by the defendant.

### III

The defendant finally claims that the court's instruction on the state's burden of proof beyond a reasonable doubt was inadequate and, therefore, diluted the state's burden of proof and violated his state and federal constitutional rights. In particular, the defendant argues that the court's instruction, which defined a reasonable doubt as " 'a real doubt, an honest doubt' " and " 'something more than a guess or surmise,' " impermissibly

diluted the fundamental protection that requires the state to prove guilt beyond a reasonable doubt. We disagree.

"It is fundamental that proof of guilt in a criminal case must be beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . The [reasonable doubt concept] provides concrete substance for the presumption of innocence— that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . [Id.], 363. At the same time, by impressing upon the [fact finder] the need to reach a subjective state of near certitude of the guilt of the accused, the [reasonable doubt] standard symbolizes the significance that our society attaches to the criminal sanction and thus to liberty itself. *Jackson* v. *Virginia*, [443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)]. [Consequently] [t]he [defendant] in a criminal case [is] entitled to a clear and unequivocal charge by the court that the guilt of the [defendant] must be proved beyond a reasonable doubt. . . .

"In determining whether a trial court's charge satisfies constitutional requirements, however, individual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury." (Internal quotation marks

omitted.) *State* v. *Reynolds*, 264 Conn. 1, 105–106, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

As in *Reynolds*, the defendant in the present case acknowledges that our courts have rejected claims regarding similar instructions on reasonable doubt. In *State* v. *Velasco*, 253 Conn. 210, 751 A.2d 800 (2000), our Supreme Court rejected the defendant's constitutional challenge to the court's instruction that a reasonable doubt "is a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence in the case." (Internal quotation marks omitted.) Id., 249. Although it was not specifically challenged in that case, the court's instruction in *Velasco* also included the language that a reasonable doubt is "more than a guess or a surmise." (Internal quotation marks omitted.) Id., 248. That language was explicitly upheld as constitutional by this court in *State* v. *Green*, 62 Conn. App. 217, 243–45, 774 A.2d 157 (2001), aff'd, 261 Conn. 653, 804 A.2d 810 (2002). In light of these decisions, and viewing the court's charge as a whole, we conclude that the court's instruction accurately conveyed the concept of reasonable doubt to the jury.

The judgment is affirmed.

In this opinion the other judges concurred.