## STATE OF CONNECTICUT *v.* JEROME RICE
### (AC 28465)

Flynn, C. J., and Harper and Peters, Js.

Argued October 23—officially released December 25, 2007

*Mary Anne Royle*, special public defender, for the appellant (defendant).

*Michele C. Lukban*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Eva B. Lenczewski*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Jerome Rice, appeals from the judgment of conviction, following a trial by jury, of one count of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims that the trial court improperly (1) denied his motion for a judgment of acquittal for insufficient evidence

where the state failed to establish the essential element of intent to kill and (2) denied his motion to suppress his signed confession where it was not knowingly and voluntarily given because he had not slept for two days and had been under the undue influence of alcohol when he signed it. We affirm the judgment of the trial court.

The following facts reasonably could have been found by the jury. On October 23, 2003, the defendant, accompanied by his friend, Frank Orr, drove from the defendant's home in New York to Waterbury to see his son and his son's mother, Tosha McClashie. After arriving, Norris McClashie, Tosha McClashie's brother, who also was a friend of the defendant, asked the defendant and Orr to go out on the town with him so that he could purchase some marijuana. They took the defendant's automobile. Sometime after they left the house, the defendant removed his Taurus nine millimeter handgun from the trunk of his automobile and placed it into his jacket pocket. While driving around in the automobile, the three men drank some forty ounce beers and may have shared a marijuana cigarette. They stopped at a few locations before ending up at Buddies Billiards (Buddies). While at Buddies, Norris McClashie (McClashie) was approached by his friend, Jose Lopez, who asked McClashie for a ride home. McClashie asked the defendant if they could drop Lopez off at home, and the defendant agreed. When they left Buddies, at approximately 12:30 a.m. on the morning of October 24, the defendant and Orr sat in the front seat, and McClashie and Lopez sat in the backseat of the defendant's automobile. At some point during the ride, Lopez took out some cocaine and asked McClashie if he wanted some. The defendant became very angry and told Lopez that he did not want drugs in his automobile, and Lopez gave the defendant a sarcastic response. Shortly thereafter, Lopez asked the defendant to stop

the automobile because he had to relieve himself. The defendant stopped, and Lopez walked to the rear of the automobile. The defendant exited the vehicle and walked behind the vehicle as well. McClashie then heard two bangs, and the defendant returned to the driver's seat. When the defendant began to drive away, McClashie asked the defendant what had happened and if he had shot Lopez. The defendant did not respond. McClashie asked the defendant to return to the scene to get Lopez and take him to a hospital, but the defendant again said nothing. The defendant drove normally and took McClashie home, telling him not to say anything about what had transpired. The defendant and Orr then drove back to New York. McClashie telephoned the defendant later in the day and asked him if Lopez was dead, and the defendant stated that he had shot Lopez in the chest and in the head. McClashie then asked the defendant why he had shot Lopez, and the defendant responded that he had never liked Lopez.

Later in the evening, McClashie gave a statement to the police. A warrant was issued for the defendant's arrest, and members of the Waterbury police department went to New York to execute the warrant. During the night of October 25, 2003, at approximately 11:30 p.m., the defendant was arrested at his New York apartment, where the police also found the gun that was used to kill Lopez. The police took the defendant to the 105th precinct in New York City. Within approximately twenty minutes, the defendant confessed to shooting Lopez and signed a written confession. He was returned to Connecticut to face trial. The defendant was tried, found guilty by the jury and was sentenced to fifty-three years imprisonment, with three years of special probation. This appeal followed. Additional facts will be set forth where necessary.

I

The defendant first claims that the court improperly denied his motion for a judgment of acquittal, in which

he claimed that the state presented insufficient evidence to prove that he had the necessary intent to shoot and kill Lopez. He argues that the evidence demonstrated that he was intoxicated at the time of the shooting and that he had smoked marijuana, which negated the element of intent. We disagree.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with

the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 402–403, 902 A.2d 1044 (2006).

To establish a violation of § 53a-54a, the crime of murder, the state must prove beyond a reasonable doubt that the defendant, "with intent to cause the death of another person . . . cause[d] the death of such person or of a third person. . . ." General Statutes § 53a-54a (a). As our Supreme Court reiterated in *State* v. *Gary*, 273 Conn. 393, 869 A.2d 1236 (2005), "[t]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference

that a defendant intended the natural consequences of his voluntary conduct. . . . In addition, intent to kill may be inferred from evidence that the defendant had a motive to kill." (Citations omitted; internal quotation marks omitted.) Id., 406–407.

Here, the defendant argues that there was insufficient evidence of his intent to kill because he was intoxicated due to alcohol and marijuana at the time he shot Lopez. "Intoxication, as used in General Statutes § 53a-7, means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body. . . . [Although] intoxication is neither a defense nor an affirmative defense to a murder charge in Connecticut, evidence of a defendant's intoxication is relevant to negate specific intent which is an essential element of the crime of murder. . . . Intoxication, however, does not automatically negate intent. . . . It is for the jury to decide, after weighing all the evidence adduced at trial, whether a criminal defendant's intoxication rendered him incapable of forming the intent required to commit the crime with which he is charged." (Citation omitted; internal quotation marks omitted.) *State* v. *LaSalle*, 95 Conn. App. 263, 271, 897 A.2d 101, cert. denied, 279 Conn. 908, 901 A.2d 1227 (2006).

In the case at bar, McClashie testified that on the night of the murder, he, the defendant and Orr were drinking some forty ounce beers while they drove around in the defendant's automobile. He also stated that he thought the defendant had smoked some of a marijuana cigarette that he had passed around, but he was not sure of that. He stated that he thought the defendant was "buzzed" but not drunk. Finally, McClashie testified that the defendant "wasn't that drunk" and that he was able to drive his vehicle without difficulty. The evidence also showed that after the defendant shot Lopez, he returned to the vehicle and drove McClashie home without incident. McClashie

asked the defendant if he had shot Lopez, and the defendant refused to answer. McClashie also asked the defendant to return to the scene to get Lopez and take him to a hospital, but the defendant would not respond. When he drove McClashie home, the defendant repeatedly instructed him not to say anything to anyone regarding what had happened. The defendant and Orr then drove back to New York. The jury also had before it the defendant's statement to the police, in which he stated that he had consumed a "couple of beers" and that McClashie had been unable to get any marijuana.

Despite what the defendant argues on appeal, the jury had before it evidence that the defendant was not intoxicated—that there was no "substantial disturbance of mental or physical capacities . . . ." General Statutes § 53a-7. Moreover, the defendant shot Lopez not once, but twice, once in the chest and once in the head, at close range. As our Supreme Court has reasoned, "[o]ne who uses a deadly weapon upon a vital part of another will be deemed to have intended the probable result of that act, and from such a circumstance a proper inference may be drawn in some cases that there was an intent to kill." (Internal quotation marks omitted.) *State* v. *Tomasko*, 238 Conn. 253, 259, 681 A.2d 922 (1996). In this case, the defendant shot Lopez in the chest and in the head, and then drove away, refusing to return to the scene to get medical attention for Lopez when requested to do so. Instead, he drove McClashie home, firmly instructing him to say nothing, and he returned with Orr to New York. The next day, when asked by McClashie why he had shot Lopez, the defendant responded that he had never liked Lopez. Given these facts, it was not unreasonable for the jury to find that the defendant had intended to kill Lopez.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient for the jury to have concluded beyond

a reasonable doubt that the defendant had formed the specific intent to kill Lopez. It was the responsibility of the jury to determine whether the defendant had been intoxicated at the time of the murder and, even if intoxicated, whether he still was able to form the specific intent to kill. On the basis of the evidence presented and the reasonable inferences drawn therefrom, we conclude that the jury reasonably could have found that the defendant had the specific intent to kill Lopez.

## II

The defendant next claims the court improperly denied his motion to suppress his signed confession on the ground that it was not knowingly and voluntarily given because he had not slept for two days and had been under the undue influence of alcohol when he signed it. We reject the defendant's claim.

The following additional facts, brought out at the suppression hearing, are relevant to our resolution of the defendant's claim. After being arrested during the late hours of October 25, 2003, the defendant was taken to the 105th precinct in New York City, where Detective John Kennelly read him his *Miranda* rights[1] in the presence of another officer, Sergeant Lee Levesque. The defendant signed a form acknowledging that he had been read his rights and that he understood them. Kennelly and Levesque also signed the form. The defendant further acknowledged, orally, to Kennelly and Levesque that he understood his rights. The officers asked the defendant if he was prepared to give a statement at that time, but he did not respond. Levesque and Kennelly then left the defendant alone for approximately ten minutes. When they returned, they again asked the defendant if he was prepared to give a statement. At this time, the defendant told the officers what had happened

---

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

and how he had shot Lopez. The officers asked the defendant to repeat his story so that they could put it in writing, and the defendant complied. The defendant could see the computer screen as Kennelly typed the statement, and, at one point, the defendant rearranged what Kennelly had typed. Once the statement was type-written, the defendant read it, confirmed its accuracy and signed it.

Kennelly and Levesque testified that no force or threats were employed in getting the defendant to confess, that the defendant was calm and cooperative, that they had detected no odor of alcohol emanating from the defendant, that the defendant appeared normal and coherent, that he did not yawn or otherwise indicate sleepiness or tiredness, that he had no trouble walking, that he did not stumble and that the defendant did not appear to be under the influence of alcohol or drugs. Additionally, Kennelly testified that the defendant appeared alert while speaking with the officers. Kennelly acknowledged that the defendant had put in his statement that he had not slept in a couple of days and that he had been drinking. The defendant did not testify at the suppression hearing.

After the hearing, the court denied the defendant's motion to suppress his written confession, concluding that the confession had been knowingly and voluntarily given after the defendant had been fully advised of his rights. The court rendered a detailed decision specifically finding that "the defendant was not intoxicated when he was arrested and brought to the precinct," that he "did not doze off at any time or display other ill affects of any lack of sleep" and that the police interrogation had not occurred in a manner "that would have been likely to overbear the defendant's will to resist and to bring about a confession that was not freely self-determined." Accordingly, the court concluded that the defendant "knowingly, intelligently and voluntarily

agreed to waive his rights," and it denied the motion to suppress the statement. We conclude that the court's findings are supported by substantial evidence.

"As an initial matter, we note that [o]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record. . . . [When] the legal conclusions of the court are challenged, [our review is plenary, and] we must determine whether they are legally and logically correct and whether they find support in the facts set out in the court's [ruling] . . . .

"Furthermore, [t]o be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . In considering the validity of a waiver, we look to the totality of the circumstances of the claimed waiver. . . . Although the issue of whether there has been a knowing and voluntary waiver is ultimately factual, the usual deference to fact-finding by the trial court is qualified in this area by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Jones*, 281 Conn. 613, 654, 916 A.2d 17, cert. denied, 552 U.S. 868, 128 S. Ct. 164, 169 L. Ed. 2d 112 (2007).

The defendant's entire argument rests on his assertion that his confession was not knowing and voluntary because he was under the influence of alcohol and he had not slept in two days. The only evidence before the court that would lend any credence to the defendant's contention that he had not slept in two days and had been under the influence of alcohol was the defendant's

written statement and the testimony of Kennelly, who acknowledged that the defendant had said this. The defendant's statement contained the following relevant details of what had occurred after the defendant shot Lopez: "I brought [McClashie] back to Tosha's house. Me and [Orr] drove back to Queens, New York. I dropped [Orr] off at a bus stop on Jamaica Avenue. It was still dark out. I drove to my apartment and started drinking beer. I put the gun in a small safe that is in the apartment. I didn't sleep for two days. Tosha called me last night and today asking me what was going on. She seemed to know that something was wrong. Tonight when the police knocked on my door, I knew it was all over. This is the truth."

It is unclear from reading this statement exactly when the two day's lack of sleep occurred. Because the statement seems to be in chronological order from the beginning to the end, it gives the impression that between the time the defendant placed the gun in his safe, in the early morning hours of October 24, 2003, and the time that Tosha McClashie telephoned him later that night, the defendant had not slept for two days. There is no indication in this statement, however, that the defendant still had not slept by the time the police arrived at 11:30 p.m. on the night of October 25, 2003, or that he had continued to drink alcohol during this time. There also was no evidence that the defendant had been so impaired at the time of his arrest that he was unable to knowingly and voluntarily waive his rights. The murder of Lopez occurred during the very early hours of October 24, 2003, not long after the four men left Buddies at approximately 12:30 a.m. Following the killing, the defendant drove McClashie home, and he and Orr then drove back to New York. Although the exact time that the defendant returned home is not in the record, his statement contains the assertion that it still was dark out. Certainly, from this assertion, one

could infer that it was very early in the morning on October 24, 2003. The police did not arrest the defendant until the late night of October 25, 2003, more than one and one-half days after the killing. We can ascertain nothing in the record that would provide proof that the defendant still had not slept before he was arrested. Additionally, the testimony of Kennelly and Levesque demonstrated that the defendant was calm, coherent, cooperative and alert. He did not smell of alcohol or appear to be under the influence of drugs or alcohol when they questioned him in the late night hours of October 25, 2003.

Acknowledging that the state has the burden of proving, by a preponderance of the evidence, that the defendant's waiver was knowingly, voluntarily and intelligently given, the court made specific, detailed findings of fact in accordance with the evidence presented at the hearing, and it concluded that the state had met its burden of proof. On the basis of our own review of the record, we conclude that the court's factual findings are supported by substantial evidence, and the court's conclusion that the defendant made a valid waiver of his *Miranda* rights on the basis of the totality of the circumstances was not improper.

The judgment is affirmed.

In this opinion the other judges concurred.