******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CHRISTOPHER LISBOA
(AC 35572)

Gruendel, Beach and Alvord, Js.

*Argued January 21—officially released March 18, 2014*

(Appeal from Superior Court, judicial district of
Windham, Swords, Boland and Mullarkey, Js.)

*S. Max Simmons*, assigned counsel, for the appellant (defendant).

*Maria Del Pilar Gonzalez*, special deputy assistant
state's attorney, with whom, on the brief, were *Patricia
M. Froehlich*, state's attorney, and *Matthew Crockett*,
assistant state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Christopher Lisboa, appeals from the judgment of the trial court, rendered after a trial to a three judge court, of conviction of murder in violation of General Statutes § 53a-54a and assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[1] On appeal, the defendant claims that the evidence was insufficient to sustain his conviction. We affirm the judgment of the trial court.

This case arises from a physical altercation between the defendant and the victim, George Rios, that left Rios dead in the defendant's apartment and the defendant charged with murder and assault in the first degree. Prior to trial, the defendant waived his right to a jury trial and elected to be tried by a three judge panel pursuant to General Statutes § 53a-45 (b). A nine day trial followed, at the conclusion of which the panel found the defendant guilty on both counts. Pertinent to the present appeal is the panel's finding that it "unanimously finds the defendant guilty, in that the defendant, acting with the intent to cause the death [of Rios], did in fact cause the death of [Rios]." The court thereafter merged the murder and assault convictions and sentenced the defendant to a term of incarceration of forty-eight years, execution suspended after twenty-five years, followed by ten years of special parole. This appeal followed.

On appeal, the defendant claims that the evidence adduced at trial was insufficient to establish that he intended to cause the death of Rios. We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the [trier of fact] are so unreasonable as to be unjustifiable. This court cannot substitute its own judgment for that of the [trier of fact] if there is sufficient evidence to support [its] verdict."[2] (Citations omitted; internal quotation marks omitted.) *State* v. *Sadowski*, 146 Conn. App. 693, 695–96, 79 A.3d 136 (2013), cert. denied, 311 Conn. 903,      A.3d (2014).

To convict the defendant of murder in violation of § 53a-54a, the state was required to prove beyond a reasonable doubt both that the defendant caused the death of Rios and that the defendant intended to cause

his death. The defendant in this appeal does not contest the panel's finding that he caused Rios' death. Rather, his sole claim is that the evidence does not support a finding that he intended to do so. Contrary to the defendant's contention, we conclude that a reasonable view of the evidence exists that supports the panel's finding that he intended to cause the death of Rios.

The panel was presented with evidence that the defendant and the victim formerly were roommates who frequently partied together and "got into the business" of drug dealing.[3] By all accounts, the two had a combustible relationship, which resulted in a fistfight at the Windham Heights housing complex in Willimantic in late July, 2009. In his August 22, 2009 statement to the state police, the defendant stated that at the conclusion of that fight, "[w]e stood up [and] shook hands and said it was good and parted ways on good terms."

The two partied together approximately one week later, consuming alcohol and drugs into the early morning hours. While at an apartment the defendant shared with Jennifer Stewart, another fight ensued between the defendant and Rios. As the defendant recounted in his police statement, Rios "hit me in the head several times, and we were pushing each other around. [Stewart] witnessed this fight. During the fight I got thrown into the refrigerator and dislocated my shoulder. . . . [Stewart] took me to the hospital." When the defendant returned to his apartment, he discovered that Rios had stolen his laptop computer, his gold chain, a box containing thousands of dollars and "about eight ounces of weed," his portable gaming device, and his friend's 2002 Jaguar automobile, which he had borrowed.

Two days later, the defendant, as he articulated in his police statement, "put out a hit on [Rios] for what he had done to me. . . . I put the word out on the street that I would pay two thousand [dollars] to anyone that brought [Rios] to me. I did not care how they brought him to me or what they had to do to get him to me. If someone brought him to me I was going to beat him up. I did not tell anyone to kill him but I may have said that I wish he would die."

Days before Rios' death, the defendant noticed a hunting knife at the home of his girlfriend, Chrimson Strede. The knife, which was admitted into evidence at trial, was black with a rope covered handle and a six inch blade. Officer Fabian Silva of the Willimantic Police Department testified at trial that the knife looked "like a hunting knife" that was used in the military. When the defendant indicated that he liked the knife, Strede gave it to him. Stewart testified at trial that this knife was the weapon that the defendant used to stab Rios to death in the early morning hours of August 22, 2009.

The panel also heard testimony that, at the defendant's behest, Stewart lured Rios into their apartment to enable the defendant to assault him.[4] On the evening of August 21, 2009, the defendant encountered Joel Rodriguez, a neighbor, while outside his apartment. Strede testified that the defendant informed Rodriguez that he was looking for Rios and cautioned him that "something was going to go down that night." Around midnight, the defendant and Strede returned to his apartment and waited in his bedroom for Stewart's signal that Rios had arrived.[5] Strede testified that upon receiving her signal, the defendant stated, "he's here, he's here . . . and [the defendant] ran out of the room." Stewart testified that when the defendant emerged from his bedroom, he immediately "bum-rushed" Rios. She clarified that, by that term, she meant that the defendant "ran up on" Rios, and the two became "like, locked and they went from one part of the room to the other, to the other and then [Rios] dropped right in front of my door. . . . [During the altercation] they hit the [television] . . . and then they went to the couch on the other side of the room and then [Rios'] body dropped." Medical Examiner Ira Kanfer testified at trial that Rios suffered seven "sharp force injuries" to his face, forehead, left arm, left leg, left hand, and left chest. Kanfer provided his expert opinion that all of the injuries sustained by Rios were consistent with the knife in question that belonged to the defendant.[6] Kanfer explained that the stab wound to Rios' chest, which was approximately three inches deep and four centimeters wide, penetrated his heart's left and right ventricles, killing him. Although paramedics responded to the apartment and transported Rios to Windham Hospital, he was pronounced dead on arrival.

In this appeal, the defendant does not contest the panel's finding that he caused the death of Rios by stabbing him in his apartment on August 22, 2009. Instead, he challenges the panel's finding that he did so with the requisite intent. "To establish a violation of § 53a-54a, the crime of murder, the state must prove beyond a reasonable doubt that the defendant, with intent to cause the death of another person . . . cause[d] the death of such person . . . . [T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim." (Citation omitted; internal quotation marks omitted.) *State* v. *Aviles*, 107 Conn. App. 209, 217, 944 A.2d 994, cert. denied, 287 Conn. 922, 951 A.2d 570 (2008).

"Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . [The trier of fact is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent."

(Citation omitted; internal quotation marks omitted.) *State* v. *Andrews*, 114 Conn. App. 738, 744, 971 A.2d 63, cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009). "Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Salaman*, 97 Conn. App. 670, 677, 905 A.2d 739, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006).

The evidence in the present case substantiates the panel's finding that the defendant possessed the intent to cause Rios' death. By his sworn admission in his statement to the police, he placed a $2000 bounty on Rios because he wanted to exact revenge on Rios in the form of a physical attack. He admitted that, at that time, he "may have said that I wish [that Rios] would die." The defendant conspired with Stewart to entice Rios to the apartment, where he secretly lay in waiting armed with the hunting knife, so that he could physically attack him. Regarding the manner in which that weapon was utilized, it is undisputed that, during the attack on August 22, 2009, the defendant stabbed Rios seven times, including a blow in which the knife plunged three inches into Rios' chest, penetrating his heart's left and right ventricles. See *State* v. *LaSalle*, 95 Conn. App. 263, 272, 897 A.2d 101 (jury reasonably could infer intent to kill from evidence that defendant stabbed victim and penetrated lung and aorta), cert. denied, 279 Conn. 908, 901 A.2d 1227 (2006). In his recorded statement to the police, which was introduced into evidence at trial, the defendant acknowledged that during the assault he "pushed the knife into [Rios]." The panel, as trier of fact, was free to infer that the defendant intended the natural consequences of that conduct. See *State* v. *Salaman*, supra, 97 Conn. App. 677.

The defendant nevertheless argues that the evidence of his conduct immediately following his stabbing of Rios indicates that he did not intend to cause his death. Specifically, he argues that testimonial evidence that he rendered aid to Rios and was visibly upset undermines any claim that he harbored such intent.

Strede, who remained in the defendant's bedroom at the time of the stabbing, testified that she eventually "got up, and I came out of the bedroom, and I saw [Stewart] standing in the doorway to the kitchen and

the living room. . . . I went into the living room [and] I saw [the defendant] holding a towel on [Rios'] stomach." Strede testified that the defendant was kneeling beside Rios' body "and he was just yelling like, 'He's dying; he's dying.' And . . . he kept saying, 'What do I do; what do I do.' " Javier Ramos, an acquaintance of Stewart's who was in her bedroom at the time of the stabbing, likewise entered the living room and saw the defendant "hovering over [Rios], checking on him . . . ." Ramos immediately fled the apartment.[7] As he did so, Ramos heard the defendant say, "Call 911, I think he's dying." When the police later arrived at the apartment, the defendant was visibly upset, in a state of shock and crying.

At the same time, it is undisputed that the defendant and Stewart concocted a home invasion story following the stabbing and "right before" Stewart placed a 911 call to the police. During that call, Stewart falsely stated that "it was a home invasion . . . [Rios] came in . . . and came at [the defendant] with a knife."[8] Although she saw the defendant applying a towel to Rios' stomach, Strede also testified that she witnessed the defendant wipe off the knife with the towel and then place the knife in Rios' hand. Stewart offered similar testimony. When Strede knelt in front of the defendant to see if he was okay, the defendant instructed her "not to say anything about wiping the knife to the cops." Both Strede and Stewart testified that they thereafter provided false statements to the police in an effort to protect the defendant.

On that evidence, the panel reasonably could have concluded that the defendant's conduct evinced a consciousness of guilt. As this court observed in *State* v. *LaSalle*, supra, 95 Conn. App. 272, "evidence that the defendant attempted to conceal the murder by washing the knife that he used to kill [the victim was] conduct by the defendant after the crime [that] reflected the defendant's consciousness of guilt . . . ." The evidence that the defendant and Stewart fabricated the home invasion story prior to placing the 911 call, that he cleaned the knife and told Strede not to tell the police that he did so, and that he then placed the knife in Rios' hand is all evidence the panel, as trier of fact, could credit in evaluating the defendant's conduct, from which intent may be, and usually is, inferred. See *State* v. *Cobb*, 251 Conn. 285, 385, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). We also note that a defendant may be found to possess the requisite intent to cause the death of a victim in instances in which he "summoned medical assistance" to the scene of the crime; *State* v. *Downey*, 45 Conn. App. 148, 155–56, 694 A.2d 1367, cert. denied, 242 Conn. 909, 697 A.2d 367 (1997); as well as in instances in which a defendant "attempted to provide medical assistance to the victim . . . ." *State* v. *Colon*, 272 Conn. 106, 229, 864 A.2d 666 (2004), cert. denied,

546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

Furthermore, the applicable standard of review neither requires nor permits this court to view the evidence and the reasonable inferences drawn therefrom in a light most favorable to the defendant and contrary to the panel's verdict. It is well established that "proof beyond a reasonable doubt [does not] require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the trier, would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Niemeyer*, 258 Conn. 510, 519, 782 A.2d 658 (2001). Construing the evidence in the light most favorable to sustaining the verdict, the panel reasonably could have concluded beyond a reasonable doubt that the cumulative force of the evidence established the defendant's intent to cause Rios' death. Accordingly, the defendant's claim of evidential insufficiency fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[2] At oral argument before this court, counsel for the defendant argued, with respect to the applicable standard of review, that our Supreme Court in *State* v. *Bennett*, 307 Conn. 758, 59 A.3d 221 (2013), misapplied that standard and "got it wrong from start to finish." We decline to address that allegation other than to note that "as an intermediate appellate body, we are not at liberty to discard, modify, reconsider, reevaluate or overrule the precedent of our Supreme Court." *DePietro* v. *Dept. of Public Safety*, 126 Conn. App. 414, 422 n.3, 11 A.3d 1149 (2011).

[3] The defendant's roommate, Jennifer Stewart, testified as to her firsthand knowledge that the defendant engaged in the sale of heroin and marijuana.

[4] Stewart testified that she feigned interest in Rios and told him that the defendant had moved out of her apartment. When asked if the defendant told her what he planned to do to Rios, Stewart answered in the negative, stating: "Not specifics. To my knowledge, it was just going to be a fight."

[5] Stewart testified that she had agreed to alert the defendant that Rios had arrived at their apartment by calling him "a couple of times. Just call and hang up and then call back without having a conversation." The defendant received such calls at approximately two o'clock in the morning of August 22, 2009.

[6] The knife was admitted into evidence at trial.

[7] Ramos testified that he fled because he was on parole and fearful of the consequences of his presence when the police arrived.

[8] The defendant's August 22, 2009 statement to the police contains a similar narrative. The defendant stated in relevant part: "On August 21, 2009, sometime around midnight into the early morning hours of August 22, 2009 I was at my apartment with my roommate [Stewart] and my current girlfriend [Strede]. . . . I was still standing in the kitchen about to go back into my bedroom . . . when I heard a noise, the door to the kitchen opening. I looked and I saw [Rios] coming into the house with a big ass fucking knife and I ran towards the living room. [Rios] came in behind me and swung at me with the knife and I grabbed his whole arm with the knife and I pushed his arm towards his body. We were all over the fricken place and I got the

knife out of his hand and I swung the knife at him. He got the knife again and then he was lying on the floor in the living room. There was blood everywhere, and I was screaming call 911, I think he's dead."

———————————————————