******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JOSEPH R. B.*
(AC 37808)

Lavine, Beach and West, Js.

*Argued December 7, 2016—officially released May 30, 2017*

(Appeal from Superior Court, judicial district of
Litchfield, Ginocchio, J.)

*Naomi T. Fetterman*, for the appellant (defendant).

*Jennifer F. Miller*, deputy assistant state's attorney,
with whom, on the brief, were *David S. Shepack*, state's
attorney, and *David R. Shannon*, senior assistant state's
attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Joseph R. B., appeals from the judgment of conviction, rendered after a jury trial, of one count of risk of injury to a child in violation of General Statutes (Rev. to 2011) § 53-21 (a) (1). The defendant claims that (1) the evidence adduced at trial was insufficient to support his conviction and (2) certain comments made by the prosecutor violated his fifth amendment right to remain silent. We affirm the judgment of the trial court.

The following facts and procedural history are relevant. On September 27, 2011, at approximately 6:30 a.m., H, the defendant's girlfriend, awoke and fed the victim, the five month old son of H and the defendant. At approximately 9 a.m., H left for work, leaving the defendant as the victim's sole caretaker. When she left for work, the victim was "fine."

Despite the fact that H was not supposed to receive telephone calls at work, the defendant telephoned H at work at approximately noon to tell her that the victim had caught his leg in the slats of the crib and it had been twisted in the effort to free it, but he said that the victim had not been injured. At approximately 3:30 p.m., H met the defendant at home, during a work break, for a scheduled home visit with Rachel Rosa, a social worker with the Department of Children and Families (department). Rosa's visit lasted about one-half hour, and, during that time, Rosa did not notice any trauma to the victim; she did notice that he was fussy and appeared uncomfortable. The defendant told Rosa that the victim had been fussy and that at approximately 2:30 p.m. the victim had finally fallen asleep. H attempted unsuccessfully to alleviate the victim's fussiness by feeding him. She took the victim's temperature, which was normal, and the victim was given Tylenol. During the visit, H held the victim and did not notice any deformity or obvious trauma to the victim's leg.

D, the victim's maternal grandmother, arrived at the house while H, the defendant, Rosa and the victim were present. D's workday ended at 3:30 p.m. and she would frequently babysit for the victim from 3:30 p.m. until H could pick up the victim, usually around 9:30 p.m. The defendant informed D that he could not watch the victim that night because he might have to work and was waiting for a telephone call in that regard. The defendant told D that the victim "hadn't been sleeping and eating and was fussy" and explained that the victim was teething. D placed the victim in the car seat and noticed that he was "whining and crying" although he usually was "[a] pretty happy baby." D took the victim to her residence. When D fed the victim a bottle, she noticed a red mark "on his knee area" and she began to rub the area, but stopped when the victim "screamed very loud." The victim also cried loudly when D put

him into his nighttime pajamas.

At approximately 9:45 p.m., H arrived at D's residence to take the victim home. At that time, D informed H that the victim "had been really cranky" and that she had noticed a spot on the victim's leg. As soon as H saw the victim she noticed that his leg was "in a frog position." H told D that she was going to take the victim to the emergency room. When H put the victim in her car, D noticed that the defendant was sitting in the passenger seat of the car. When D asked the defendant why he did not watch the victim if he did not have to work, the defendant bowed his head and did not answer.

Upon arriving at Charlotte Hungerford Hospital, H informed the triage nurse that the defendant had told her that at around noon the victim had been crying as a result of having caught his left leg in the slats of his crib and that the defendant had freed the leg. The triage nurse immediately sent the child to Alison Tieman, an emergency room nurse, who evaluated the victim. Upon examining the victim's left leg, Alison Tieman noticed that it was "very obviously . . . drawn up, the baby was not willing to straight[en] out his leg and there was actually swelling noted . . . between his knee and thigh area." A physician took an X ray of the victim's left leg and found a displaced fracture of the left femur. When Alison Tieman relayed this information to the victim's parents, H was "hysterically crying" and the defendant was "sitting quiet." The defendant explained that at approximately noon he had noticed a line on the victim's thigh area that appeared to be swollen, but the line had vanished.

Jason McIntyre, an officer with the Torrington Police Department, was dispatched to Charlotte Hungerford Hospital to investigate the injury. The defendant gave a statement to McIntyre. The statement, written and signed by the defendant, was admitted as a full exhibit at trial. The defendant said in the statement that H had left for work at approximately 9 a.m. He later fed and played with the victim and placed him in his crib at about 11:15 a.m. At about noon, the defendant noticed that [the victim's] "left leg was sticking out of the crib." The defendant extricated the victim's leg and "picked him up to check on his leg." The defendant noticed that the victim had a red mark on the top of his leg, but he did not notice any bruising. The defendant held the victim "when I got his leg out because he was whining." At 2:30 p.m., the defendant fed the victim some apple juice. Rosa and H arrived around 3:30 p.m., and D took the victim to her house. When H arrived at D's house later that night she noticed something wrong with the victim's left leg and took the victim to the hospital.

The victim, meanwhile, was transferred to Connecticut Children's Medical Center, where he was treated. He was also evaluated by the Suspected Child Abuse

and Neglect team (team). Nina Livingston, a physician board certified in general pediatrics and child abuse pediatrics, was the director of the team. She testified at trial that the victim suffered a transverse fracture of the left femur: "the bone was completely broken through in two pieces . . . closer to the knee than to the hip." Bone disease was ruled out as the cause of the injury. She explained that "a transverse fracture is the result of a bending force. This could result from a direct blow or from a bending force applied to the bone in another fashion." Livingston explained that injuries are evaluated with reference to the child's developmental level and by taking into account "what kinds of trouble they can get into on their own." She stated that a five month old infant would not be able to cause this type of injury to himself. When asked if it was the type of injury that could result from the normal handling of an infant, Livingston replied "absolutely not." She testified that this type of injury would not be expected to result from a normal effort to remove a five month old baby's leg from a crib. Livingston further explained that at the time of injury the baby would experience significant pain. If, however, the leg were still for a period of time, Livingston stated that the infant may calm down and may even eat or intermittently sleep. Once the leg was moved, however, the infant would exhibit pain behavior such as crying or being excessively fussy. Livingston also noted that symptoms of pain and swelling could go unnoticed for hours.

At about midnight on September 28, 2011, Michael Pitruzzello, an investigator with the department, received a telephone call from staff at Charlotte Hungerford Hospital stating that a five month old patient at the hospital had a broken femur, that the explanation given for the victim's injury was suspicious, that the injury was not consistent with the explanation provided, and that the child was being transported to Connecticut Children's Medical Center. Pitruzzello interviewed the victim's parents. The defendant explained to Pitruzzello that he lived in the house where the victim resided and that he was the sole caretaker of the victim from the time H left for work until she returned at 3:30 p.m. He said that the victim had gotten his leg stuck in the crib but that he had freed it with relative ease. He did not offer an explanation to Pitruzzello as to how the injury had occurred.

On the morning of September 28, 2011, Kevin Tieman, a detective with the Torrington Police Department, interviewed the defendant at his residence. The defendant stated that although at one point the victim had his leg caught in the slats of the crib, he did not notice any injury. He said that he made a telephone call to H and the victim then went to sleep. The defendant asked, "Well, what if it was an accident?" The defendant mentioned a second possible scenario in which he may have leaned forward and put some pressure on the victim

but that the victim did not make any sound.

Following a trial, the jury found the defendant guilty of risk of injury to a child. The court imposed a total effective sentence of ten years incarceration, execution suspended after five years, and five years probation with special conditions. This appeal followed.

## I

The defendant first claims that there was insufficient evidence to support his conviction of risk of injury to a child. He argues that there was no physical evidence of the cause, the timing or the identity of the perpetrator of the injury, and that his conviction was based on pure speculation.[1] We reject his arguments.

"When reviewing sufficiency of the evidence claims, we impose a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. . . . Second, we determine whether, from that evidence and all the reasonable inferences which it yields, a [trier of fact] could reasonably have concluded that the defendant was guilty beyond a reasonable doubt. . . . In this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct." (Citation omitted; internal quotation marks omitted.) *State* v. *Burrus*, 60 Conn. App. 369, 372, 759 A.2d 149 (2000), cert. denied, 255 Conn. 936, 767 A.2d 1214 (2001).

General Statutes (Rev. to 2011) § 53-21 (a) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . shall be guilty of a class C felony . . . ." Section 53-21 (a) (1) "comprise[s] . . . two distinct prongs, the situation prong and act prong . . . ." (Internal quotation marks omitted.) *State* v. *Owens*, 100 Conn. App. 619, 635, 918 A.2d 1041, cert. denied, 282 Conn. 927, 926 A.2d 668 (2007). The defendant was charged under the "act" prong. "Under the act prong of our risk of injury statute [t]he four elements the [fact finder] needed to find to return a verdict of guilty are: (1) the victim was less than sixteen years old; (2) the defendant committed an act upon the victim; (3) the act was likely to be injurious to the victim's health . . . and (4) the defendant had the general intent to commit the act upon the victim." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Patterson*, 131 Conn. App. 65, 78–79, 27 A.3d 374 (2011), aff'd, 308 Conn. 835, 68 A.3d 83 (2013). "Specific intent is not a necessary requirement of [§ 53-21 (a) (1)]. Rather, the intent to do some act coupled with a reckless disregard of the consequences . . . of

that act is sufficient to [establish] a violation of the statute." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 173, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

The defendant argues that there was insufficient evidence to support the conclusion that he caused the injury to the victim. He contends that the evidence presented at trial did not establish beyond a reasonable doubt the state's theory that he handled the victim roughly when the victim's leg was caught between the slats of his crib, thereby causing his femur to break. The defendant argues that there was no evidence that the injury had occurred during the time he was the victim's sole caretaker, that he was the perpetrator or that he had the requisite intent. He argues that he ceased being the victim's sole caretaker at approximately 3:30 p.m. when Rosa and H arrived at the house, and that Rosa changed the victim's diaper twice and did not observe any injuries to the victim, even though the injury was described as obvious by the emergency room nurse. He claims that D took the victim to her house at approximately 3:30 p.m., but the injury was first discovered by H at approximately 9:45 p.m., when she picked the victim up at D's house. Neither Livingston nor McIntyre were able to determine exactly how the injury was caused.

Viewing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the defendant was the perpetrator and that he possessed the requisite general intent. There was evidence that the injury occurred sometime between 9 a.m. and 3:30 p.m. on September 27, 2011, during which time the defendant was the victim's sole caretaker. When H left for work around 9 a.m. she noted that the victim was fine. During Rosa's scheduled visit at 3:30 p.m., the victim was inconsolably fussy.[2] When D took custody of the victim following Rosa's scheduled visit, she noticed a red mark on his knee area and he screamed loudly when she touched it.

A second, consistent logical path supporting the finding of identity could have been followed. The jury reasonably could have found that the victim was unharmed at 9 a.m. but seriously injured at 9:45 p.m. The defendant and D were the only people who were alone with the victim during that time. D described only usual caretaking events during the time in which she was the victim's sole caretaker and, according to her, no injury occurred on her watch. The jury could have reasoned that the injury occurred either while the defendant was the caretaker or while D was the caretaker, and if it credited D's testimony, then the injury must have occurred during the time in which the defendant was the sole caretaker of the victim. See *State* v. *Andersen*, 132 Conn. App. 125, 143, 31 A.3d 385, 396 (2011) (whether witness' testimony believable is question for jury), cert. denied,

305 Conn. 906, 44 A.3d 182 (2012).

In his statement to the police, the defendant admitted that the victim's left leg had become stuck in the crib. The left femur, the evidence revealed, was fractured. The defendant stated that he freed the victim's leg, and that later the victim was whining and had a red mark on the top of his leg. Although the defendant did not admit to having exerted much force on the victim's leg, the jury reasonably could have inferred that he had caused the fracture, in light of the medical testimony previously discussed.

Evidence of the defendant's subsequent actions and statements provided additional evidential support. When D asked the defendant why he had not continued to care for the child despite the fact that he did not work that day, he did not answer and only bowed his head. When the defendant and H were informed of the nature of the injury, the defendant sat quietly. Throughout the course of the investigation into the victim's injury, the defendant told health care professionals, investigators and police officers about the incident earlier that day when the victim's leg was caught in the crib. Livingston testified that a five month old child could not have inflicted this type of injury on himself and that the injury was caused by a "direct blow or from a bending force." When interviewed by the police in his home the next day, the defendant offered a different explanation, stating that he may possibly have leaned on the child.

The fact that the evidence as to the defendant's identity as the perpetrator, aside from his statement to police, was largely circumstantial does not undermine the verdict. "There is no distinction between direct and circumstantial evidence as far as probative force is concerned. . . . Indeed . . . circumstantial evidence may be more certain, satisfying and persuasive than direct evidence. . . . Where . . . the identification of the defendant . . . is derived from circumstantial evidence, we examine the cumulative impact of a multitude of factors in order to determine whether the identification of the defendant has been satisfactorily established by the circumstantial evidence. . . . The issue of the identification of the accused as the perpetrator of the crime is peculiarly one of fact to be resolved by the jury. . . . If evidence, whether direct or circumstantial, should convince a jury beyond a reasonable doubt that an accused is guilty, that is all that is required for a conviction." (Citations omitted; internal quotation marks omitted.) *State* v. *Scales*, 38 Conn. App. 225, 228–29, 660 A.2d 860 (1995).

We turn briefly to the issue of intent. As noted previously, specific intent is not an element of risk of injury to a child; rather, only the general intent to do the act with a reckless disregard of the consequences is required. *State* v. *Sorabella*, supra, 277 Conn. 173. A

fact finder may rely on medical testimony to determine intent. See *State* v. *McClary*, 207 Conn. 233, 244, 541 A.2d 96 (1988) (medical testimony used to establish that infant's injury caused by intentional shaking). "Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 66, 43 A.3d 629 (2012). In this case, Livingston testified that the injury could not have been self-inflicted and could not have resulted from normal handling; rather, it had to have been caused by a direct blow or bending. This testimony, coupled with the defendant's admissions noted previously, is sufficient evidential support for the conclusion that the defendant had the general intent to perform the act of subjecting the child's leg to undue force with a reckless disregard of the consequences.

II

The defendant next claims that the prosecutor made improper comments during closing and rebuttal arguments, and thereby violated his right, guaranteed by the fifth amendment to the United States constitution, to remain silent. We disagree.

"[W]hen the defendant claims that the prosecutorial impropriety infringed a specifically enumerated constitutional right, such as the fifth amendment right to remain silent . . . the defendant initially has the burden to establish that a constitutional right was violated. . . . If the defendant establishes the violation, however, the burden shifts to the state to prove that the violation was harmless beyond a reasonable doubt." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *A. M.*, 324 Conn. 190, 198, 152 A.3d 49 (2017).

We first must determine whether the defendant established that the prosecutor's remarks during his closing and rebuttal argument violated the defendant's fifth amendment right to remain silent.[3] "It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution." (Internal quotation marks omitted.) *State* v. *Ruffin*, 144 Conn. App. 387, 400, 71 A.3d 695 (2013), aff'd, 316 Conn. 20, 110 A.3d 1225 (2015). Additionally, our legislature enacted General Statutes § 54-84 (a), which provides in relevant part: "Any person on trial for crime shall be a competent witness, and at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official . . . ."

The comments at issue do not directly refer to the defendant's decision not to testify. We employ the "natu-

rally and necessarily" standard "when it is unclear whether the prosecutor's comments at issue referred to the defendant's failure to testify . . . ." *State* v. *A. M.*, supra, 324 Conn. 202. Under this standard we ask: "Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify? . . . Further, in applying this test, we must look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury. . . . Finally, [w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Parrott*, 262 Conn. 276, 293, 811 A.2d 705 (2003).

We further note that "to violate the fifth amendment, the prosecutor's comments need not imply that the jury should draw an adverse inference from the defendant's silence. It is enough that the comment by an adverse party calls the jury's attention to the defendant's silence because any such comment heighten[s] the jury's awareness of the defendant's silence, namely, his failure to answer to the state's charges . . . [and] is improper. . . . When the defendant chooses not to testify, he takes the risk that the jury will view his silence with skepticism—a prosecutor's explicit reminders to the jury of the defendant's decision serves only to heighten this risk, burdening the defendant's constitutional right to remain silent. . . . Although the extent to which the prosecutor's comments implied that the jury should hold the defendant's silence against him may relate to the harmfulness of the violation, it does not impact our conclusion that a violation occurred in the first place." (Citations omitted; internal quotation marks omitted.) *State* v. *A. M.*, supra, 324 Conn. 203–204.

The defendant argues that the prosecutor repeatedly urged the jury to draw an unfavorable inference from his decision not to testify by telling the jury in different contexts that the defendant "knows what he did."[4] He argues that the prosecutor improperly remarked on the defendant's failure to testify by implying that he was the only person who could provide the missing information. He further argues that the remarks implied that the defendant had knowledge of his guilt and that he did not testify because he did not want the jury to discover his guilt.

Viewing the remarks in the context of the evidence presented at trial and the entirety of the prosecutor's argument, we think it unlikely that the jury interpreted them as referring to the defendant's failure to testify.[5] The comments directed the jury's attention to circumstantial evidence presented at trial. The prosecutor tried to persuade the jury that the defendant had the general

intent to do the act of removing the victim's leg from the slats of the crib in a forceful manner with a reckless disregard for the consequences. See *State* v. *Sorabella*, supra, 277 Conn. 173. The prosecutor's comments that the defendant "knew he used too much force," that he "knows why he used way too much force," that "he did nothing about it," and that he "compounded [his] mistake by not telling [H]" addressed the defendant's intent in removing the victim's leg from the crib and could be viewed as styling the defendant's admitted behavior as consciousness of guilt. The comments were based on evidence and did not draw attention to the defendant's failure to testify. The comments helped to develop the state's theory that the defendant's action in removing the child's leg from the crib, which conduct the defendant admitted in his statement to police, was not an accident; rather, the defendant intended to exert the force that was used.

The prosecutor discussed the defendant's statement to Rosa that the victim had gone to sleep and argued that the statement showed a desire to conceal the victim's injury. The prosecutor mentioned the defendant's requesting that D watch the victim, despite his availability, to demonstrate his state of mind. Even if the comments conceivably were ambiguous—in that they perhaps could be viewed as inviting refutation that never occurred—they nonetheless were not improper. "[W]hen a prosecutor's potentially improper remarks are ambiguous, a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." (Internal quotation marks omitted.) *State* v. *Felix R.*, 319 Conn. 1, 9, 124 A.3d 871 (2015). The prosecutor referenced only those statements that were made by the defendant to others at the time of the events in question. We conclude that the prosecutor's comments regarding the defendant's knowledge that he had used too much force when freeing the victim's leg did not infringe on the defendant's constitutional right to remain silent.

The defendant also challenges another argument made by the prosecutor during rebuttal: "[Defense counsel] said to you, 'We would all like to find out who did this.' *And the state argues to you right now there's one person in this room who hopes we don't find out who did it. And he's sitting right there. Because he knows what he did, he knows that he handled that child too roughly.* He knows that resulted in a traumatic injury to his child and he didn't do anything about it, he tried to cover it up." (Emphasis added.) He argues that the italicized remarks cast the defendant's silences as a "purposeful impediment to the trial's truth-seeking function" and that the jury would necessarily take these remarks to be a comment on the defendant's decision not to testify.

During closing argument, defense counsel presented the theory that someone other than the defendant caused the injury and implied that the injury occurred when the victim was in D's care. Defense counsel stated: "We would all like to be able to know who actually committed this crime." During rebuttal argument, the prosecutor responded to this statement. "It is well established that [a] prosecutor may respond to the argument of defense counsel during rebuttal." (Internal quotation marks omitted.) *State* v. *Lindsay*, 143 Conn. App. 160, 179, 66 A.3d 944, cert. denied, 310 Conn. 910, 76 A.3d 626 (2013). The comment, invited by defense counsel's argument, was not improper. See *State* v. *Singh*, 259 Conn. 693, 716 n.22, 793 A.2d 226 (2002) (comments invited by defense counsel's closing argument not improper).

The comment, far from "naturally and necessarily" directing attention to a failure to testify, was a reasonable rhetorical device. When the defense suggested that everyone would "like to be able to know who actually committed the crime," the state's response was that the defendant, sitting right there, did not want everyone to know who did it, because he was the one who did it. The remark surely directed attention to the defendant, but not "naturally and necessarily" to his failure to testify.

The defendant argues that the prosecutor, through a series of questions beginning with the word "why," improperly commented on the defendant's decision not to testify by asking for explanations that only the defendant could provide.[6] "[C]alling the jury's attention to the fact that the defendant did not offer his own in-court explanation of the events . . . is not allowed. . . . The test is whether the prosecutor's comment . . . calls on the defendant for information or for an explanation that only the defendant could be expected to supply. . . . If the comment does so, it is impermissible. . . . The reason for the constitutional and statutory rights given by the fifth and fourteenth amendments and § 54-84 is to reduce jury speculation as to why the defendant would remain silent. A comment that the defendant was without a reasonable explanation or had no reasonable explanation to show why he was innocent is not necessarily a comment that the jury would naturally and necessarily interpret as related to the defendant's constitutional and statutory right to decline to testify. A prosecutor also may comment on the failure of a defendant to support his factual theories." (Citations omitted; internal quotation marks omitted.) *State* v. *Smalls*, 78 Conn. App. 535, 542–43, 827 A.2d 784, cert. denied, 266 Conn. 931, 837 A.2d 806 (2003).

An examination of the applicable case law shows that questions posed in closing arguments, even when answers perhaps could be provided by nontestifying

defendants, may, depending on the circumstances, be permissible. If a comment or question logically refers to the relative merits or weaknesses of the case, rather than "naturally and necessarily" to the defendant's failure to testify, it passes muster. See *State* v. *Jarrett*, 82 Conn. App. 489, 502, 845 A.2d 476 (jury would not naturally and necessarily interpret prosecutor's statement that " '[t]here was no explanation why the defendant had [an insurance policy that was seized during the search of the apartment] with his other personal documents' " as comment on defendant's failure to testify), cert. denied, 269 Conn. 911, 852 A.2d 741 (2004); *State* v. *Bowens*, 24 Conn. App. 642, 650–51, 591 A.2d 433 (permissible to argue that money found on defendant accused of selling drugs was unexplained), cert. denied, 220 Conn. 906, 593 A.2d 971 (1991); *State* v. *Iovieno*, 14 Conn. App. 710, 724–25, 543 A.2d 766 (permissible to refer to "fingerprint that can't be explained," where referring to lack of evidence), cert. denied, 209 Conn. 805, 548 A.2d 440 (1988); *State* v. *Kluttz*, 9 Conn. App. 686, 705–706, 521 A.2d 178 (1987) (permissible to question whether there was reasonable explanation for conduct, where reasonable to infer comment directed to evidence).

The jury would not naturally and necessarily understand the prosecutor's remarks to suggest that testimony from the defendant was the only means by which his rhetorical questions could be answered.[7] Rather, the prosecutor's comments were based on the evidence presented and refer to a lack of explanation in the evidence, other than guilt, for a range of behavior, including telephoning H to inform her of an inconsequential incident, not telling Rosa about the victim's having caught his leg in the slats of the crib, remaining in the car when H picked up the victim from D's house, and telling others that the victim was fussy but omitting the detail from his statement to McIntyre. See, e.g., *State* v. *Pires*, 122 Conn. App. 729, 750, 2 A.3d 914 (2010) (remarks referring to lack of explanation given by defense did not infringe on defendant's right not to testify), aff'd, 310 Conn. 222, 77 A.3d 87 (2013). "A comment that the defendant was without a reasonable explanation or had no reasonable explanation to show why he was innocent is not necessarily a comment that the jury would naturally and necessarily interpret as related to the defendant's constitutional and statutory right to decline to testify. A prosecutor also may comment on the failure of a defendant to support his factual theories." *State* v. *Smalls*, supra, 78 Conn. App. 543; see also *State* v. *Colon*, 70 Conn. App. 707, 713, 799 A.2d 317 (prosecutor's comments as to lack of explanation for defendant's fleeing after crime constituted attack on defendant's theory of case, not improper comment on failure to testify), cert. denied, 261 Conn. 933, 806 A.2d 1067 (2002).

The prosecutor's remarks implicitly asked the jury

to conclude that the defendant was guilty because of a variety of behaviors. "[A defendant], by his failure to testify, cannot insulate himself from general comment on the weakness of his case, even though his failure so to testify may be perceived by the jury as having contributed to the general weakness about which comment is made." *State* v. *Magnotti*, 198 Conn. 209, 220, 502 A.2d 404 (1985). We reject the defendant's contention that prosecutor's comments naturally and necessarily were interpreted by the jury to be a reference to his failure to testify.

The judgment is affirmed.

In this opinion the other judges concurred.

\* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] We reject the suggestion that the prosecutor's comments during closing argument are germane to the sufficiency issue.

[2] During the mid-afternoon visit, neither Rosa nor H noticed any trauma to the victim's leg. Livingston testified that although the child would have experienced significant pain at the time of the injury, the child could eat or sleep shortly afterwards, but would still experience pain if the leg was moved.

[3] The fifth amendment to the United States constitution, which the fourteenth amendment makes applicable to the states, provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

[4] In support of his argument, the defendant highlights the following remarks that were made by the prosecutor during closing and rebuttal argument:

"He knew he used too much force, he knew that child's leg broke, he heard that child scream and he thought, uh-oh, I better do some damage control, I don't know."

"[N]ow he's thinking uh-oh, I know what I did, I know the mistake I made and the mistake I made—I compounded my mistake by not telling my girlfriend . . . . So, what is he thinking, he knows why he did it, he knows why he used way too much force."

"Think about the audience, think about what happened that day, what he knows happened . . . ."

"He was the caregiver present, he knew about it and he did nothing about it."

"Well, why is he saying to them, 'Hey I just got him to go down.' And the [department] worker said, yeah, you know, he said that because he doesn't want them to go over and pick up that child or move that child around because he knows that that's going to cause the child to cry even more. Because you move the leg around, the kid is going to start crying again—the baby is going to start crying again. He knows that. But he says, no, I may have to go to work. But then he never goes to work. He never goes to work. So why did he not call the grandmother and say, I'll come pick him up or can you drop him back off I'm not going to work. I want to be with my inconsolable, crying child. Because he doesn't want to be because he knows what he did—he doesn't want to be around that child because he knows what he did and he's having major guilt feelings."

"Yes, the police officers can't tell you, they weren't there, they can't tell you who did it. The [department] workers were not there . . . . You know, we don't have eye witnesses in these cases; it's just the way it goes. . . . If we had an eye witness we wouldn't be here probably."

[5] We have construed the phrase "he knows he did it" to be the prosecutor's effort to explain the defendant's behavior at the time of the incident, that is, that he behaved as he did because he knew he used too much force. We take this occasion to stress that the state may not even indirectly highlight a defendant's failure to testify nor may a prosecutor suggest that he or she has any private knowledge of the defendant's guilt.

[6] The defendant argues that the following remarks of the prosecutor were improper:

"Why did he call his . . . girlfriend that day? Why did he call his girlfriend that day if it was a nonincident? If the child wasn't hurt at all, if the child didn't scream out like Dr. Livingston testified a child would when it first

happened, why did he even call her? Because [H] testified that she's not supposed to get calls at work, she could get in trouble when she gets calls at work. So why would he call and tell her about it if it was just a nonincident? Think about this. Why would he call her when it happens all the time supposedly?"

"Why would he tell the mother about this, but then neglect to tell the [department] worker that's at the house about it?"

"If it was really such a nonincident and he didn't hear that snap why wouldn't he say, well—you know, maybe something is wrong with the leg— you know, maybe there's some minor ligament tear, or a—something, a strain. *Why doesn't he say that to her?* He said that to the mother, he said it to his girlfriend. Why doesn't he tell it to the grandmother as well? The grandmother is there, he tells her he's been fussy all day, not napping, not sleeping, teething, yes, teething. *Why not tell her?* She's the one that's taking custody of that child. Hey, you might want to watch out there was this incident—you know, keep an eye on it. Doesn't tell her. How about the whole thing that he told Detective Tieman some several days later about there was an incident that day where he may have slipped or may have fell or—and put too much weight down on the child. Remember how he told Tieman that—Detective Tieman, several days later? *Why didn't he tell any of those people there that day?*" (Emphasis added.)

"Why would he come all the way in the car, but not get out of the car and come into the house? Odd."

"The last thing I'd like you to think about is why did he give a statement to Officer McIntyre, under oath, at that hospital and lie in that statement? . . . . Why did he write that and why did he swear to it and why did he sign his name under oath? Why did he tell everybody else that he was fussy, not eating, not napping all day? Think about the audience, think about what happened that day, what he knows that happened, what's in the back of his mind and who his audience is and when he's talking to them?"

[7] A logical reading of the remarks in question is that they were merely rhetorical devices to prompt the jurors to mull in their own minds why the defendant said and did certain things, rather than part of an effort to direct the jurors' attention to a failure to testify. Viewed in this light, the issue has no substance.

————————————————————